**HYBRITECH INCORPORATED, a California corporation, Plaintiff,**

v.

**MONOCLONAL ANTIBODIES, INC., a California corporation, Defendant.**

**No. C–84–0930 SC.**

United States District Court, N.D. California.

Aug. 28, 1985.

## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

CONTI, District Judge.

This case came on regularly for trial on the 5th day of August, 1985, without a jury, and the trial consumed fifteen days. Plaintiff was represented by Lyon & Lyon of Los Angeles, California, and defendant was represented by Cartwright, Sucherman, & Slobodin, and Flehr, Hohbach, Test, Albritton & Herbert, of San Francisco, California.

The following exposition and later contents herein are all to be considered the court's Findings of Fact and Conclusions of Law.

*The Parties*

This is a suit by plaintiff Hybritech, Inc. for alleged infringement by defendant Monoclonal Antibodies, Inc. of U.S. Patent No. 4,376,110, entitled "Immunometric Assays Using Monoclonal Antibodies," issued March 8, 1983, to Gary S. David and Howard E. Greene, on application filed August 4, 1980 (hereinafter referred to as the "'110" patent). The plaintiff, Hybritech, commenced its operations in 1979, and the defendant, Monoclonal Antibodies, Inc. (hereinafter sometimes referred to as MAB) also commenced its operations in 1979; both companies are involved in the development, production and sale of diagnostic kits. While the plaintiff markets a broad range of these kits, defendant's kits are limited for pregnancy and ovulation.

*The Patent in Suit*

The patent in suit is directed to an alleged invention by Dr. Gary David, an immunochemist, and Ted Greene, a science graduate who has worked in management, relating to the development of diagnostic products.

The patent in suit concerns the use of monoclonal antibodies in sandwich assays. Monoclonal antibodies are genetically engineered cells called "hybridomas". These hybridoma cells are produced by fusing mouse spleen cells and malignant mouse cells (called Myelomas). The said patent,

Lyon & Lyon, Los Angeles, Cal., for plaintiff.

Flehr, Hobach, Test, Albritton & Herbert, Cartwright, Sucherman & Slobodin, San Francisco, Cal., for defendant.

cells and assays will be more fully discussed hereinafter.

The invention is a process for determining the presence of, or the amount of, antigen in a fluid sample, such as a patient's blood or urine. An antigen is a substance, usually a protein or carbohydrate, that when introduced into the body stimulates the production of an antibody. One example of an antigen is a foreign substance in the body which causes disease, such as a virus. Another is a substance which evidences a condition of the body. For example, the antigen IgE (immunoglobulin E) is an indication of an allergy condition; the antigen CEA (Carcinoembryonic Antigen) is an indication of colon cancer; and the antigen hCG (human Chorionic Gonadotropin) is an indication of pregnancy. Generally, an antibody may be defined as a substance produced by the body's immune system in response to the presence of a foreign antigen.

The invention of the patent, sometimes called a "sandwich" or "two-site" assay, is a method of analyzing fluids for antigens, employing certain antibodies called "monoclonal antibodies", and taking advantage of their unique properties to obtain an extremely fast, sensitive and accurate analysis. The key issue in this case is whether the defendant has overcome the presumption of non-obviousness.

The subject matter of this patent deals principally with the medical field of immunology, i.e., the workings of the body's immune system.

One of the miraculous processes of the body is its immune system. Each cell in the body has a distinct shape on its surface that distinguishes it from foreign cells. The body's army, its immune system, controls unfamiliar shapes using special troops made in the bone marrow. Certain blood or plasma cells known as lymphocytes learn to recognize the foreign molecular structure of the foreign cell or substance known as the antigen and produce antibodies which lock on to the antigen. The antigen or harmful foreign substance which "raises" the antibody is then rendered harmless in various ways. The antibody/antigen reaction is still not well understood by scientists but it may be thought of as a lock and key fitting arrangement. An antibody at its reactive site is a shape which fits and locks onto a corresponding site on the antigen known as an epitope.

The body has millions of different kinds of lymphocytes each capable of producing an antibody of a very particular structure for the purpose of seeking out a single epitope on an antigen. Once the body is invaded by an antigen a lymphocyte which produces an antibody specific for that antigen will reproduce or clone itself in vast numbers so that a large supply of antibodies to conquer the invader may be produced. These antibodies will be specific for a particular epitope on the antigen. These antibodies being of identical molecular structure, all being made of the same clones, may be termed monoclonal antibodies. However, in the body of an animal, even though monoclonal antibodies are produced by the animal, they are always found together with other antibodies. Therefore, when the blood or serum of an animal is taken for its antibodies, the mixture found is known as "polyclonal antibodies" because it is derived from different (poly)-clones.

Introduction of an antigen into the body is termed "immunization" because it stimulates production of polyclonal antibodies which can cause immunity to the infection caused by that antigen. Most antigens are also complex and have a large number of distinct epitopes. One characteristic of an antibody is its specificity or ability to bind to a particular epitope. Another characteristic is sensitivity, defined as the smallest amount of antigen that can be detected by the antibody. Sensitivity is related to a theoretical characteristic known as affinity, which is a measure of the binding strength of an antibody for its antigen. While affinity calculations can be made for simple or small molecules, it is very difficult to do for large, complex molecules involving extremely complex reactions and can only be

estimated. Also, the affinity estimations vary to a significant extent, depending upon the conditions of experiments used for the estimations.

Although the polyclonal antibodies were and are effective tools for use in immunoassay, they had certain disadvantages. If the animal died, the source of antibodies was gone and no one knew how antibodies from a different animal would compare. Also, the immune system of the animal could suddenly change the type of antibody being produced. Thus, supply of antibodies was limited and uncertain.

Since it was known that the body produced "monoclonal antibodies" within the body or "in vivo", scientists knew that if they could produce these monoclonal antibodies outside of the body or "in vitro", these problems and others would be solved. However, the plasma cells making the antibodies would not live outside of the animal and the concept of large scale production of monoclonal antibodies was only a dream until Kohler and Milstein produced their classic paper in 1975 based on a discovery they had made on how to produce monoclonal antibodies. For this work, Kohler and Milstein in 1984 received a Nobel prize.

Georges Kohler and Cesar Milstein took a tumor consisting of cancer cells which grew in vitro and fused them with normal antibody producing cells. The fusion resulted in what is called a hybridoma cell. These hybridoma cells could survive, and be cultured in vitro. Through the use of other techniques, the individual hybridoma cells could be segregated and the segregated individual cells could be cloned. These clones produce antibody molecules of identical structure or monoclonal antibodies. Suddenly, it became possible to produce tailor-made, highly specific monoclonal antibodies in vast quantities. The obvious uses for diagnostic purposes of these monoclonal antibodies became evident to those in the scientific and commercial world.

Two well-known diagnostic assay procedures using polyclonal antibodies in the prior art included "competitive assays" and "sandwich assays". In a competitive assay for an antigen in a sample, a known quantity of the same antigen is labelled. In a competitive assay for an antigen, the limited amount of antibody is bound to a solid surface. The sample containing an unknown amount of antigen is contacted with the antibody together with a known amount of labelled antigen. The labelled antigen will "compete" with any unlabelled antigen to react with the bound antibody. If there is no antigen in the test sample, all of the antigen attached to the antibody will be labelled. The greater the amount of antigen in the test sample, the less the amount of labelled antigen there will be detected. Since only a limited amount of antibody is required, this competitive test was popular with polyclonal antibodies because of the difficulty of obtaining large amount of antibodies.

In one form of the sandwich assay for the antigen, a large amount of antibody is bound to the solid surface and it is exposed to the test sample containing the unknown amount of antigen. If antigen with epitopes recognized by the antibody is present, it should bind to the antibody on the solid surface. At that point, labelled antibody, also in excess amount, is added to the solution. The labelled antibody will now bind to an epitope on another part of the antigen, thus the formation of a sandwich. See Figure 1. If all of the reagents, i.e., reacting materials, antibodies and antigen, are added at the same time, it would be termed a simultaneous sandwich assay. All of this was known to the prior art.

## FIGURE 1 – SANDWICH ASSAY

People working in immunology aware of the Kohler and Milstein discovery, knew that monoclonal antibodies could be used in place of polyconal antibodies in virtually every use to which the polyclonals had been put, e.g., monoclonal antibodies in a sandwich assay. While the idea was a simple one, putting it into practice was time consuming, and expensive, because of the steps necessary to produce the monoclonals for commercial diagnostic purposes. There are a number of complex steps to be gone through before such kit would be available. Suitable screening assays must be developed to select the best antibody-producing clones from perhaps hundreds of thousands of them. The sheer work and time involved in "cell forming" is also considerable.

The following is a schematic illustration of hybridoma formation. Monoclonal antibody is produced against hepatitis B surface antigen (HBs–Ag).

It was not too long before various entrepreneurs in this country decided that this

technology would be worth exploiting. While the concept, e.g., of using monoclonal antibodies in a sandwich assay was simple and obvious, the work and technology involved in coming up with the right antibody, testing for it, finding economically feasible ways to attach antibody to solid surface to label antibody, would be difficult and expensive.

A Stanford MBA, named Thomas Glaze, decided in the summer of 1978 that he would form a company (the defendant company herein) to produce monoclonal antibodies to replace polyclonal antibodies in diagnostics. Mr. Glaze, as evidenced by his business plan, intended to contact certain customers who were using sandwich assays with polyclonal antibodies. The defendant Monoclonal Antibodies, Inc. (MAB) was formed in April, 1979. The evidence indicated discussions in the fall of 1979 involving the use of monoclonal antibodies in sandwich assays. In March of 1980, MAB began selling monoclonals and informed others, both orally and in writing, that sandwich assays were included among their potential uses. Plaintiff's patent application was not filed until August 4, 1980, and the patent did not issue until March 8, 1983. Without any knowledge of the activities at Hybritech, MAB on its own, developed commercial kits using monoclonal antibodies in sandwich assays. After obtaining government approval, MAB, in November of 1982, had a kit on the market.

An experienced marketing manager with an MBA from Harvard, named Ted Greene, had similar ideas. He was brought in in early 1979 to become president and chief executive officer of Hybritech, Inc. (Hybritech), a company which had been formed a few months earlier, also to develop monoclonal antibodies to be used in place of polyclonals. While the Hybritech people had considered the various uses to which the new monoclonal antibody tool could be put, one of which was in assays such as a sandwich assay, they had not yet decided exactly what they would be doing regarding monoclonal antibodies in diagnostics. They did, however, know that they were going to develop monoclonal antibodies an-

tigens and they began to do so. At no time before May of 1980, is there any documentation whatsoever which even suggests that the idea at Hybritech of using monoclonal antibodies in sandwich assays would be innovative. Nor is there any clear or corroborated testimony with regard to when before May of 1980, the idea of actually using monoclonals in sandwich assays was first discussed.

During the time frame in question, at least five different groups of workers in the field employed sandwich assays using monoclonal antibodies. For example, at La Jolla Cancer Research Foundation (LJCRF) a team of scientists headed by Dr. Ruoslahti and including Drs. Engvall and Dr. Uotila, developed and ran a simultaneous sandwich assay using monoclonal antibodies. Laboratory notebooks proved this was done no later than November 5, 1979. This work was submitted to two respected scientific journals and published in November of 1980 in the Journal of Immunological Methods. At the exact same time that this work was going on, Hybritech, then a fairly small company, had its offices and shared space and equipment with LJCRF.

As early as July 1978, and merely because monoclonal antibodies were available at the Stanford University Laboratory of Dr. Herzenberg, a sandwich assay using monoclonal antibodies was performed. This work was published in December 1979, in a Journal called Molecular Immunology. The sandwich assay was one of a series of diagnostic procedures set forth by Dr. Herzenberg, who did not single out the sandwich assay as anything out of the ordinary.

Hybritech, by the spring of 1980, had raised many millions of dollars with the backing of venture capitalists. They were thus able to afford and hire a man of vast experience in diagnostics and patents by the name of Dr. Thomas Adams. This was done in April 1979.

One of the first things Adams wanted to know as an executive of Hybritech was what subject matter there was that the company could patent. In a memorandum

to Greene on April 25, 1980, re "patentable ideas", Adams, after setting forth a few ideas stated:

> Also can we try for a general patent on the use of labelled monoclonal Ab [antibody] or coating with monoclonals if we can show meaningful advantages over conventional antiserum?

As of April 25, 1980, even though they discussed patentable ideas, there is no mention of the subject matter of the patent in suit. Dr. Adams then decreed that every technical worker at Hybritech should have an idea notebook. On April 28, Dr. Gary David, Hybritech's chief scientist, wrote a number of entries in his "idea notebook", none of which included the subject matter in question. May 6 is his first entry which suggests only that the simultaneous assay using monoclonal antibodies is new. In the same month, experiments were carried out, so that now Hybritech had reached the point where they, too, had run a simultaneous sandwich assay using monoclonal antibodies.

In the first review of the patent application by the U.S. Patent and Trademark Office (PTO), the Patent Examiner rejected all of the originally filed claims as being obvious under Section 103 of the patent statute (35 U.S.C. § 103) in view of the Cuello prior art reference, alone or in combination with other prior art references. The Cuello reference disclosed using monoclonal antibodies in an immunoassay and the other references disclosed sandwich assays using polyclonal antibodies. The Examiner pointed out that Hybritech's application conceded that the sandwich assay protocols of the claim are old and concluded "... it would be obvious to use the monoclonal antibody for the polyclonal antibodies in the conventional immunoassay protocols defined by the instant claims ..."

As hereinabove noted, competitive and sandwich assays are similar. In Cuello, monoclonal antibodies were used in a competitive type assay.

Hybritech's attorney argued that based upon the differences between a competitive and a sandwich assay, it would not be obvious to use the monoclonal antibodies of Cuello in the sandwich assay. The Examiner was not convinced by the arguments,

and again (the second time) rejected the claims on grounds similar to the first rejection.

Hybritech's attorney then amended the broadest claims to include a numerical limitation (at least $10^8$ liters/mole) regarding the affinity (strength of binding) of the antibodies to corresponding antigen and restated his arguments. Hybritech's attorney supported his argument with a declaration from Richard Bartholomew, a Hybritech employee, alleging certain advantages of using monoclonal antibodies rather than polyclonal antibodies in sandwich assays.

It is obvious that in order to perform in a sandwich assay, the antibodies have to be of high affinity. Hybritech used $10^8$ liters/mole as the arbitrary cutoff point in their selection of antibodies for further testing during the antibody development phase. It was well known that high affinity antibodies were required for these assays in the prior art.

The so-called reasons for allowance were not well-founded because (1) the alleged advantages were expected as naturally flowing from the well-known natural characteristics of monoclonal antibodies compared to polyclonal antibodies; (2) alleged advantages were not significant but argued to the Examiner as if they were; or (3) were at best minor advantages of certain monoclonal antibody sandwich assays and not applicable to all monoclonal antibodies as claimed by Hybritech.

The credible testimony of J. Blakemore indicated that the reasons for the final granting of the patent by the Examiner were not scientifically valid and misplaced.

It is of the utmost importance to be aware that shortly after Kohler and Milstein's discovery made monoclonal antibodies known and they became available, their advantageous use in various immunoassays was predicted by a number of authorities, none cited by the Patent Office.

A 1978 edition of Cellular Immunology, in a chapter relating to monoclonal antibodies, Drs. Herzenberg and Milstein, is stated at page 25.1: "Apparently inexhaustible supplies of pure, specific, standardized antibody can now be assured for almost any clinical or laboratory immunoassay."

In January 1979, in Chemical and Engineering News, is stated: "... [A]dapting monoclonal antibodies to radioimmunoassay [immunoassays using radioactive labels] that are widely used in clinical tests is a predictable, potentially important development ..."

In early March, 1980, in Nature, in an article dealing with immunometric or sandwich assays, Dr. Ekins stated: "... Combined in the exploitation of the in vitro hybridoma techniques of antibody production pioneered by .. [Kohler and Milstein] ... with which large quanitities of monospecific antibodies can be produced, the emergence of simple and reliable assay procedures far surpassed current .. [competitive assays] .. in sensitivity, precision, speed, specificity and overall reliability is within sight ..."

In his February 1980 article in Clinical Microbiology Newsletter, Dr. Sevier of Hybritech, stated under the hearing "Uses in Immunoassay: "An essentially unlimited supply of monoclonal antibodies, precisely defined according to amount and affinity, will lead to major improvements and innovations in immunochemical techniques. For immunodiagnostics, monoclonal antibodies will improve performance, reduce costs and open up types of immunological testing. More obvious advances will include: ... Antibodies for use with ... enzyme ... immunoassays ..."

Furthermore, as conceded by Hybritech, the sandwich assay procedures using polyclonal antibodies were well known in the orders of addition of antibody to antigen of the patent in suit. (See, e.g., the simultaneous assay of the Jeong patent 4,244,940).

In addition, monoclonal antibodies of affinity in excess of $10^9$ liters/mole were known (Frankel and Gerhard article in Molecular Immunology, DX:AB), as was the desirability of polyclonal antibodies of such affinity in immunoassays, including sandwich assays.

In December, 1979, Oi and Herzenberg published an article in Molecular Immunology disclosing the use of monoclonal antibodies in a sandwich assay based upon work performed in 1978 and submitted for publication in April 1979. The article refers to the subject matter of the patent in suit merely as a modification of a radioimmunoassay, i.e., other well-known technology.

*Authority Regarding Validity*

A. *Obviousness:*

Section 103 provides as follows:

A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. ...

The Patent Examiner felt the subject matter was obvious and only changed his mind in reliance on the Bartholomew Declaration. He did not have available the various references noted before. The trial testimony of experts indicate the bases for the issuance of the patent by the Examiner was incorrect. (See testimony of J. Blakemore).

In view of the foregoing, it would be obvious to substitute in a known sandwich assay, known high affinity monoclonal antibodies for polyclonal antibodies of similar affinity for the known advantages of monoclonal antibodies over polyclonal antibodies in immunoassays.

B. *Prior Invention of Others*

Plaintiff's patent is invalid under 35 U.S.C. § 102(g):

"... before the applicant's invention thereof the invention was made in this country by another who has not abandoned, suppressed, or concealed it."

Based on the above facts, the simultaneous sandwich assay using high affinity monoclonal antibodies (greater than $10^9$ liters/mole) was reduced to practice by LJCRF in the United States as early as November, 1979, long prior to the August 4, 1980 filing date of the '110 patent. LJCRF continued the work on the project

by conducting further experiments, and preparing papers and patent applications which ultimately were filed and published. Even if such reduction to practice were secret, it would invalidate the patent if the invention was not abandoned, suppressed or concealed. LJCRF did not abandon, suppress or conceal since steps were taken to make the invention publicly known and it diligently pursued publication and filed a patent application. Therefore, the Foundation's reduction to practice constitutes prior art under 35 U.S.C. § 102(g) and is prior art at least as early as November 5, 1979.

The same is also true for the work of Oi and Herzenberg, where the reduction to practice took place in July of 1978.

Hybritech did not establish an earlier date of invention than the above two mentioned references since there is no credible evidence of conception prior to May of 1980.

### C. Invalidity under 35 U.S.C. § 112

The limitation of an affinity for the antigen of at least about $10^8$ liters/mole is present in all of the '110 patent claims, and was added by amendment during prosecution in response to the first rejection by the Examiner. Also, the affinity limitation was cited by the Examiner as a reason for allowance. In spite of this significance attributed to it during prosecution, the specification fails to teach how to obtain monoclonal antibodies having such affinities or why the limitation is significant. The first paragraph of Section 112 requires a written description of the invention in sufficient detail so that one can perform it. The specification fails to disclose how to measure affinities (if they can be "measured" rather than merely estimated). Also, it fails to disclose whether affinity is determined (1) when the antibodies are in their natural form as produced by the hybridoma, or (2) after the antibodies are either bound to the support surface or attached to the labelled antibody.

The first paragraph of Section 112 also requires applicant to set forth the best mode contemplated by the inventor for carrying out his invention. However, the specification fails to disclose how to form and screen the many hybridoma cells lines to identify those hybridoma that produce antibodies having the specified affinities.

Under the second paragraph of Section 112, the claims must particularly point out and distinctly claim the invention. As discussed above, the specification of the '110 patent does not disclose any method for determining the affinities of monoclonal antibodies. The definiteness requirement of § 112 is not met if the patent does not disclose to the public how infringement may be avoided. Norton Company v. Bendix Corporation, 449 F.2d 553, 555 (2d Cir.1971). Since the antibody affinity was inserted as a limitation in all of the broadest (independent) claims of the '110 patent and argued by Hybritech to be a critical limitation, those of ordinary skill in the art must be able to determine this number with certainty in order to determine whether they are infringing. There is no standard set of experimental conditions which are used to estimate affinities and the variations in the values which are estimated.

The court, in reaching its conclusion that the patent in issue is invalid, is persuaded by the credible testimony of Dr. Vernon Oi, Judy Blakemore, Thomas Ciotti, Dr. Scott Monroe, Dr. Leonard Hertzenberg, Dr. Ruoslahti, and Dr. Amshey.

Laughton Miles in the late 1960's made known the sandwich assay with the use of monoclonal antibodies.

Kohler and Milstein gave the know-how for the development of monoclonal antibodies.

All the modes of assay were known by the prior art. The testing kits and procedure prior to Kohler and Milstein used polyclonal antibodies, and once Kohler and Milstein invented the technology for developing monoclonal antibodies, it was obvious to use monoclonal antibodies in a sandwich assay where polyclonal antibodies had been used in the past.

The testimony of plaintiff's own witness and co-inventor of the patent in suit, in

discussing the key elements of the patent, stated: the patent states that you need antibodies with high affinity—yet he says this was known in the prior art. Also, he (David) says you need remote sites on the antigen; however, a sandwich assay to work well must have remote sites—this is obvious, and yet the patent does not tell you how to do this—David went on to state that this was known in the literature. In sum, you screen till you get two antibodies that work in an assay.

Even the witness for plaintiff, Dr. Nisonoff, stated that "once monoclonal antibodies were known it would be logical and expected that monoclonal antibodies would reach equilibrium faster because of the known physical properties of monoclonal antibodies, and if you were working with monoclonal antibodies you would consider their affinity when thinking of diagnostic uses.

Dr. L. Hertzenberg, Ph.D, and with a world-wide reputation, and who worked in the Milstein laboratory in England, stated that in 1977 he did a sandwich assay with monoclonal antibodies. Hertzenberg stated that the monoclonal assay was obvious.

It is the court's conclusion that the major advance was the invention of Kohler and Milstein in the making of monoclonal antibodies, that is the ability to clone a cell to the properties you want and to have that clone cell live forever.

Once the scientific community had the monoclonal antibody it was obvious and logical to those expert in the field to use them in known assays as substitutes for products (polyclonal antibodies) of inferior qualities.

The plaintiff has not sustained the burden of proof with the requisite corroborative evidence as to the "date of conception" or the date of "Reduction to Practice".

The court further finds that plaintiff's contention to rebut obviousness, to wit: the commercial success of the kits re the patent in suit, is unpersuasive. Commercial success, to be meaningful indicia of unobviousness, must be related directly to the claimed inventions. Here the court finds that the commercial success of the kits may well be attributed to the business expertise and acumen of the plaintiff's personnel, together with its capital base and marketing abilities. Business success is not the ultimate criteria for unobviousness.

The defendant has not been able to sustain its burden of proof re inequitable conduct on the part of the defendant.

The matter or infringement is moot, as the court finds the patent in issue invalid.

The court makes further findings of fact and conclusions of law, even though some of the following findings and conclusions are repetitive to the foregoing, for the sake of completeness and to give due reference to the facts that the court has found.

1. Plaintiff, Hybritech, Inc. (hereinafter "Hybritech") is a corporation organized and existing under the laws of the State of California and has its place of business at 11085 Torreyana Road, San Diego, California.

2. Defendant, Monoclonal Antibodies, Inc. (hereinafter "Monoclonal"), is a corporation organized and existing under the laws of the State of California and has its principal place of business at 2319 Charleston Road, Mountain View, California.

3. This is an action for infringement of U.S. Letters Patent No. 4,376,110 (hereinafter the "'110 patent").

4. The application for the '110 patent was filed August 4, 1980, and named Gary S. David and Howard E. Green as joint inventors. It issued March 8, 1983 and was assigned to Hybritech. It relates to the use of monoclonal antibodies having affinities of at least $10^8$ liters/mole in sandwich assays for detecting antigens. The antigen is sandwiched between a bound antibody on a solid carrier and a labelled antibody. Claims 1–9 are directed to a reverse sandwich assay in which the labelled antibody is reacted with the antigen prior to contact with the bound antibody. Claims 10–18 are directed to a simultaneous sandwich assay in which the antibodies and antigen are reacted simultaneously. Claim 19 is direct-

ed to the sandwich assay without specifying the order of addition of reagents. Claims 20–29 are dependent on claim 20.

5. As conceded by Hybritech in the patent, the use of polyclonal antibodies in sandwich assays was well known prior to the alleged invention of the '110 patent with various orders of addition of reagents, including the reverse and simultaneous mode. U.S. Patent No. 4,244,940 (Defendant's Exhibit A) to Jeong, et al., issued January 13, 1981, discloses a simultaneous sandwich assay using polyclonal antibodies. U.S. Patent No. 4,098,876 to Piasio, et al., issued July 4, 1978, discloses a reverse sandwich assay using polyclonal antibodies. U.S. Patent No. 4,016,143 to Shuurs, et al., issued April 5, 1977, discloses a forward sandwich assay using polyclonal antibodies.

6. A method for producing monoclonal antibodies in vitro was well known prior to the alleged invention of the '110 patent. This method was disclosed first in an August 7, 1975 publication in Nature, Vol. 256, pp. 495–497, by G. Kohler and C. Milstein entitled "Continuous Cultures of Fused Cells Secreting Antibody of Predetermined Specificity." (Testimony of Blakemore, Defendant's Exhibit AL.)

7. The existence of monoclonal antibodies having the affinity constants claimed in the '110 patent was well known prior to the alleged invention of the '110 patent. For example, monoclonal antibodies having affinities of greater than $10^8$ and some greater than $10^9$ liters/mole were disclosed in a February 1979 publication in Molecular Immunonology, Vol. 16, pp. 101–106 by M.E. Frankel and W. Gerhard entitled "The Rapid Determination of Binding Constance for Anti-Viral Antibodies by a Radioimmunoassay." Defendant's Exhibit AB—per Blakemore testimony.

8. The use of monoclonal antibodies in competitive assays ("RIA"), was well known prior to the alleged invention of the '110 patent. This use was disclosed in a July 1979 publication in the proceedings of the National Academy of Science, Vol. 76, No. 7, pp. 3532–3536, by A.C. Cuello, G. Galfre and C. Milstein, entitled "Detection of Substance P in the Central Nervous System by a Monoclonal Antibody". Defendant's Exhibit V.

9. Sandwich assays using monoclonal antibodies were disclosed in a December 1979 publication in Molecular Immuniology, Vol. 16, pp. 1005–1017, by V.T. Oi and L.A. Herzenberg, entitled "Localization of Murine Ig–Ib and Ib–Ia ($IgG_{2a}$) Allotypic Determinants Detected with Monoclonal Antibodies"; long prior to the alleged invention of the '110 patent.

10. The alleged invention of the '110 patent was contemporaneously developed by at least five different groups of workers in the field and was disclosed in various patent applications and publications between the filing date and the issue date of the '110 patent. For example, European Pat.App. No. 81220768 (defendant's Exhibit G), Akvo N.V. published February 3, 1982, Bulletin 82/5; European Pat.App. No. 81302809.0 (defendant's Exhibit H), Unilever N.V., published December 30, 1981, Bulletin 82/52; European Pat.App. No. 81106832.9, La Jolla Cancer Research Foundation, published March 31, 1982, Bulletin 82/13; and P.C.T.App.P.C.T./US 81/01270, (defendant's Exhibit N) Massachusetts General Hospital, published April 1, 1982, all disclose sandwich assays using monoclonal antibodies.

11. Shortly after the Kohler and Milstein disclosure of monoclonal antibodies stated in Finding 6, the use of monoclonal antibodies in immunoassays was expected and predicted by numerous authorities and commentators in the field. For example, the following publications predicted the use of monoclonal antibodies in immunoassays:

(a) The 1978 publication in Handbook of Experimental Immunology, D. Weir, Editor, Blackwell Scientific Publications, Oxford, pp. 25.1–25.7, by L.A. Herzenberg and C. Milstein entitled "Cell Hybrids of Myelomas with Antibody Forming Cells and T-Lymphocytes with T-Cells", states: "The recent adaptation of cell hybridization techniques to the construction of myeloma-like cell lines producing monoclonal antibodies with desired reactivities has essentially rev-

olutionized the approach to production and utilization of immunospecific reagents. Apparently inexhaustible supplies of pure, specific, standardized antibody can now be assured for almost any clinical or laboratory immunoassay."

(b) The January 1979 publication in Chemical and Engineering News, Vol. 57, No. 1, by J.L. Fox entitled "Antibody Reagents Revolutionizing Immunology" states "... [A]dapting monoclonal antibodies to radioimmunoassays that are widely used in clinical tests is a predictable, important development ..." (Defendant's Exhibit AA).

(c) The June 1979 publication in AJE-BAK, Vol. 57, Part 3, pp. 231–344 by G.F. Mitchell et al., entitled "Hybridoma Antibody Immunoassays for the Detection of Parasitic Infection: Development of a Model System Using a Larval Cestode Infection in Mice" states: "Monoclonal antibodies derived from anti-parasite antibody-secreting hybridoma cell lines will be of particular use in the development of new, highly specific, immunodiagnostic reagents for the detection of parasite infection, exposure and disease." (Defendant's Exhibit A).

(d) The 1979 publication in Antibodies in Human Diagnosis and Therapy, E. Haber and R.M. Krause, editors, Raven Press, New York, pp. 225–236 by N.R. Klinman, G.P. Segal, W. Gerhard, T. Braciale and R. Levy, entitled "Obtaining Homogeneous Antibody of Desired Specificity from Fragment Cultures" states: "Perhaps the most obvious of antibodies of a known restricted specificity would be diagnostic." (Defendant's Exhibit AE).

(e) The winter 1979 publication in Ligand Review, Vol. 1, No. 2, by D.S. Skelly entitled "Antibodies: New Developments", states: "The use of monospecific antibodies in immunodiagnostic testing is obvious." (Defendant's Exhibit BE).

(f) The February 1980 publication in The Yale Journal of Medicine, Vol. 53, pp. 71–83 by A. Baumgarten entitled "Viral Immunodiagnosis" states "... The specificity and uniformity of monoclonal antibodies should markedly improve diagnostic accuracy ..."

(g) The February 1980 publication in Clinical Microbiology Newsletter, Vol. 2, No. 3, pp. 1–2 by D.E. Sevier, an employee of plaintiff, entitled "Revolutionary Reagents: Monoclonal Antibodies from Hybridomas" states: "An essentially unlimited supply of monoclonal antibodies, precisely defined according to amount and affinity, will lead to major improvements and innovations in immuno medicine techniques. For immunodiagnostics monoclonal antibodies will improve performance, reduce costs and open up types of immunological testing. More obvious advances will include: .. antibodies for use with ... enzyme ... immunoassays ..." (Defendant's Exhibit BB).

(h) The March 6, 1980 publication in Nature, Vol. 284, p. 14 by R. Ekins, entitled "More Sensitive Immunoassays", states "Combined with the exploitation of the in vitro hybridoma techniques of antibody production pioneered by Milstein and his colleagues at Cambridge ... with which large quantities of monospecific antibodies can be produced, the emergence of simple and reliable assay procedures far surpassing current RIA techniques in sensitivity, precision, speed, specificity, convenience and overall reliability is within sight."

12. The prior art stated in Findings 7, 9 and 11 was not considered during prosecution of the application. This art was more pertinent than the art considered by the Examiner.

13. Any commercial success of the patent was caused by the sudden availability of a new reagent, monoclonal antibodies, together with further reasons hereinabove stated.

14. The primary advantages of monoclonal-based sandwich assays are due to the inherent, known and expected properties of monoclonal antibodies. Any other advantages, expected or not, are insignificant in comparison to the primary advantages.

15. Any differences between the prior art stated in Findings 5, 6, and 7, viewed with or without the prior art stated in Finding 11, and the '110 patent, would have been obvious to one of ordinary skill in the

immunoassay art at the time the alleged invention of the '110 patent was made.

16. Any differences between the prior art stated in Findings 7 and 9, viewed with or without the prior art stated in Finding 11, and the '110 patent, would have been obvious to one skilled in the immunoassay art at the time the alleged invention was made.

17. Any differences between the prior art stated in Findings 5, 6, 7 and 8, viewed with or without the prior art stated in Finding 11, and the '110 patent, would have been obvious to one skilled in the immunoassay art at the time the alleged invention was made.

18. A simultaneous sandwich assay using monoclonal antibodies having affinity constants greater than $10^9$ liters/mole was reduced to practice by researchers M. Uotilla and E. Ruoslahti at La Jolla Cancer Research Foundation in the United States as early as November 1979.

19. The reduction to practice of Finding 18 resulted in the preparation and publication of an article in The Journal of Immunological Methods in 1981 by them, and the preparation and the filing of a patent application in Sweden in 1980 by Pharmacia, which was assigned to the Foundation.

20. A sandwich assay using monoclonal antibodies was reduced to practice by Vernon Oi at Standford University in July 1978.

21. This reduction to practice of Finding 20 resulted in a publication in the Journal of Immunology in 1978 and a publication in Molecular Immunology in December 1979.

22. The reductions to practice set forth in Findings 18 and 20 were not abandoned, suppressed or concealed.

23. The claims of the '110 patent are not limited in scope to particular antibodies or concentrations.

24. The specification of the '110 patent fails to disclose how to measure affinities and fails to disclose whether affinity is determined (1) when the antibodies are in their natural form as produced by the hybridoma or (2) after the antibodies are either bound to the support surface or attached to the label.

25. The specification of the '110 patent fails to disclose how to form and screen the many hybridoma cell lines resulting from cell fusion and to identify the particular hybridoma-producing antibodies having the affinities required to practice the processes claimed.

## CONCLUSIONS OF LAW

1. The '110 patent is invalid under 35 U.S.C. § 103 in view of the December 1979 publication by V.T. Oi and L.A. Herzenberg, and the February 1979 publication by M.E. Frankel and W. Gerhard. *Lear Siegler, Inc. v. Aeroquip Corp. et al.*, 733 F.2d 881 (Fed.Cir.1984); *Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d 1452 (Fed. Cir.1984). With respect to the secondary considerations relevant to a determination of obviousness, where the primary advantages of the invention are known and expected, unexpected other advantages cannot rebut evidence of obviousness. *In re Nolan*, 553 F.2d 1261 (CCPA 1977). Finally, commercial success must be related to the claimed invention. Where commercial success is based on the sudden availability of starting materials, in this instance the availability of monoclonal antibodies as a result of the Kohler and Milstein discovery, business acumen, marketing ability, and capital sources, no causal relationship is proven. *Technograph Printed Circuits Ltd. v. United States*, 164 USPQ 584 (Comm'r Op.Ct.Cl.1970).

2. The said patent is invalid because it teaches nothing new in the art, the art alleged to be taught was obvious and logical to anyone skilled in the field.

3. The '110 patent is invalid under 35 U.S.C. §§ 102(g), 103, in view of prior "inventions" and teachings.

4. The '110 patent is invalid under 35 U.S.C. § 112, first paragraph, because it fails to disclose the best mode known to Hybritech of screening hybridomas to ob-

tain appropriate monoclonal antibodies, and fails to disclose the best mode known to the applicant of forming the hybridomas to be used in the production of monoclonal antibodies.

5. The '110 patent is invalid under 35 U.S.C. § 112, first paragraph, because it fails to teach how to measure affinity and fails to disclose whether affinity is determined when the antibodies are in their natural form or after being bound to a support or attached to a label.

6. The '110 patent is invalid under 35 U.S.C. § 113, second paragraph, because the claims are indefinite; they do not disclose how infringement may be avoided because antibody affinity cannot be estimated with any consistency. *Norton Co. v. Bendix Corp.*, 449 F.2d 553 (2d Cir.1971).

7. The defendant has proven patent invalidity and prior invention by clear and convincing evidence.

8. Defendant's kits do not infringe the '110 patent because of the said patent's invalidity.

Judgment is granted in favor of defendant and against plaintiff. Defendant shall be entitled to its costs.