**ENDRESS + HAUSER, INC. and Endress + Hauser GMBH & Co., Plaintiffs,**

v.

**HAWK MEASUREMENT SYSTEMS PTY. LIMITED and Hawk America, Inc., Defendants.**

**No. IP 92–440 C.**

United States District Court, S.D. Indiana, Indianapolis Division.

June 27, 1995.

Donald E. Knebel, James A. Coles, Mark Janis, Dwight D. Lueck, Barnes & Thornburg, Indianapolis, IN, for plaintiffs.

Thomas G. Watkins III, Cahill, Sutton & Thomas, Phoenix, AZ, for defendants.

## ENTRY REGARDING PATENT VALIDITY ISSUES

BARKER, Chief Judge.

In the first part of the bifurcated trial, this Court found that Defendants Hawk Measurement Systems Pty. Limited, Inc., and Hawk America, Inc. ("Defendants" or "Hawk") literally infringed Plaintiffs Endress + Hauser, Inc.'s and Endress + Hauser GmbH's (collectively "E + H" or "Plaintiffs") patent. *See Endress + Hauser, Inc. v. Hawk Measurement Systems Pty.*, 32 U.S.P.Q.2d 1768, 1994 WL 736442 (S.D.Ind. Aug. 29, 1994). On April 3–6, 1995, this Court conducted a bench trial on the remaining issues of patent validity and damages. Having considered the evidence, authorities, and briefing, the Court finds that claims 43, 44, and 46 are not invalid. The Court will address the issue of damages in a subsequent entry.

## I. FINDINGS OF FACT ON VALIDITY

### A. Introduction

1. The Court's previous opinion dated August 29, 1994, and reported at 32 USPQ2d 1768 (S.D.Ind.1994), set forth the identities of the parties, the nature of the technology, and the facts and circumstances surrounding the infringement of the '650 patent by Hawk.

2. The Court previously found that certain devices made and sold by Hawk literally infringe claims 43, 44, and 46 of the '650 patent. For purposes of the following analysis of validity, claims 43, 44, and 46 are at issue.

3. Claims 43, 44, and 46 relate generally to a control system for use in monitoring the level of material in a storage tank. (DX1)[1]. The system addresses the problem of selecting the true echo return from multiple false echoes returning from the tank sidewalls. (DX1, col. 2, lines 24–33). Included in the claimed system is circuitry providing level indicating means which discriminates among the echo returns to select the true echo return from the multiple false returns. (DX1).

4. Hawk focuses on the prior art "Donar" publication (DX21) and two prior art patents, U.S. Patent No. 2,943,296 to Fryklund (DX–10) ("the Fryklund patent") and U.S. Patent No. 3,921,122 to Christoff (DX25) ("the Christoff patent"). Hawk argues that each of claims 43, 44, and 46 is anticipated by the Donar reference. Hawk also argues that the claimed invention in each of claims 43, 44, and 46 would have been obvious in view of the Donar publication combined with the Fryklund patent. Hawk also contends that the claimed invention in each of claims 43, 44, and 46 would have been obvious in view of the Christoff patent combined with the Fryklund patent.

### B. Prior Art

#### 1. The Donar Publication (DX21)

5. The Donar publication (DX21) describes an experimental imaging system in which the objective is to process all of the returns to develop a "picture" of the entire environment being imaged. (Silva Testimony). The Donar publication (DX21) does not describe a level measurement system, in which the objective is to select a single return representing the distance between the transducer and the level of the material being measured, nor does the Donar publication contain any suggestion that the system it describes be combined with level measurement technology. (Silva Testimony).

6. Mr. Beazley, the designer of the infringing Hawk device, performed a worldwide literature search for prior art references that might be reasonably pertinent to the problem of designing a level measurement system for operation in a closed environment, and in doing so did not identify the Donar publication. (Beazley Testimony).

7. The Donar publication describes an experimental imaging system (*see* functional diagram, Fig. 1 of DX21 at p. 167) and three experiments designed to evaluate the system's performance (*see* Figs. 4a and b; Figs. 5a and b; and Figs. 6–9, DX21).

---

1. The Court adopts the abbreviations used by the parties. DX1 refers to Defendants' Exhibit 1. PX1 stands for Plaintiffs' Exhibit 1.

8. The experiments illustrated in Figs. 5 and 6–9 of the Donar publication confirm that the object of the Donar system is to provide an image, rather than to provide a single number representative of distance as would be the case in a level measurement system. (Silva Testimony). In the Fig. 5 experiment, in which the ultrasonic pulse is used to measure the thickness of a 1.67 mm lucite plate in water, at least a portion of the ultrasonic pulse (referred to as the "thickness mode wave", DX21, p. 172) must be propagated through the plate. Similarly, in Figs. 6–9, the system is used to measure the dimensions of a PVC tube having an outer diameter of about 2.5 mm (i.e., about one-tenth of an inch) in water. There is no evidence that this imaging operation bears any resemblance to a level measurement operation, in which the ultrasonic pulse would be reflected from the top surface of the material to be measured, and penetration through the material would be avoided.

9. Nowhere in the discussion of the Fig. 5 or Figs. 6–9 experiments is there any disclosure or suggestion of the geometry or dimensions of whatever container is used to hold the water. Hawk's demonstrative diagram DX92, which hypothesizes a container of a specified geometry having sidewalls of a particular dimension, is without factual foundation because no such disclosure is actually found in the Donar reference. In addition, DX92 is inherently unbelievable because the container illustrated in that diagram would be less than half an inch wide.

10. Because Hawk's illustration of the hypothetical tank sidewalls is without any foundation in the actual Donar publication, Hawk's illustration of multiple false echoes reflecting from those sidewalls is equally lacking in any factual foundation. The Donar publication does not contain any disclosure of multiple false echoes reflecting from any imagined container sidewalls. (Silva Testimony). The inventor of the '650 patent addressed the problem of discriminating among multiple false echoes in a closed environment to identify the true echo representing level. (DX1, col. 2, lines 24–33). Thus, the experiments described in Figs. 5 and 6–9 of the Donar publication are not even direct-

ed to the problem being addressed in the '650 patent.

11. The description of the Fig. 4 experiment in the Donar publication does not mention the relative dimensions of whatever container may have been used to contain the water, or the dimensions of the aluminum plate. (DX21). Nor does it refer in the Fig. 4 experiment to multiple false echo reflections received from hypothetical sidewalls. (Silva and Beazley Testimonies).

12. The Fig. 4 experiment only illustrates the output pulse from the transducer itself by directing the output pulse through water at an aluminum plate, where the aluminum plate was effectively acting as an acoustic mirror. (Silva Testimony). The Fig. 4 experiment had two purposes, neither of which has anything to do with level measurement. First, the experiment "presented the opportunity of examining the waveform from the bismuth alloy-backed transducer" itself. (DX21, Fig. 4a, p. 171; Silva Testimony). Second, the experiment showed that the transducer pulse was "well-damped" (that is, the transducer flexed initially and oscillated only briefly thereafter). (DX 21, Fig. 4b, p. 171; Silva Testimony).

13. Hawk's arguments that Figs. 4a and 4b disclose multiple false echo returns (and circuitry for dealing with such returns) lack a factual basis. There is no basis in the Donar reference for the conclusion that Fig. 4a illustrates multiple false echo returns from hypothetical tank sidewalls, and there is likewise no basis for the conclusion that Fig. 4b illustrates the automatic selection, by the Donar circuitry, of the true echo after the elimination of false echoes. (Silva Testimony). Instead, Figs. 4a and b represent nothing more than the transducer "taking a picture of itself" using the aluminum plate as an acoustic mirror. *Id.*

14. Hawk also emphasizes that the system described in the Donar publication includes a computer. However, the Donar publication does not disclose or suggest that the computer should be programmed to select the maximum from among multiple false echo returns, because there is no mention of false echo returns in the Donar publication. (Silva Testimony). That the Donar publica-

tion refers to the printing of selected parts of a curve, including maxima, as one of its data evaluation options, makes no difference to this analysis. Even if this data evaluation option were chosen, an operator would be needed to review the group of maxima and select from among them the desired return. (Silva Testimony).

### 2. *The Fryklund Patent (DX10)*

15. Fryklund discloses an ultrasonic level measurement system that employs analog techniques that were in use in the 1950's. (DX10).

16. Hawk has admitted that Fryklund, taken alone, lacks converting means, level indicating means, integrating means, and monitoring means. (DX104). Hawk thus has effectively admitted that Fryklund does not anticipate any of the claims and is relevant only to the extent that it might be combined with other prior art references as part of Hawk's obviousness defense.

17. During prosecution of the patent application which matured into the '650 patent, the patent applicant disclosed the Fryklund patent to the patent examiner, (PX B, Amendment Before First Action, pp. 4–5), and explained why Fryklund could not be properly combined with certain other prior art references as part of an obviousness rejection. (PXB, Amendment Before First Action, pp. 13–15).

### 3. *The Christoff Patent (DX25)*

18. The Christoff patent discloses a digital signal processing and display technique that is used in a target tracking sonar system. (DX25, col. 2, lines 3–7). The sonar system is specifically designed for use as a hazard avoidance aid in the operation of high speed watercraft. (DX25, col. 2, lines 15–18).

19. Although Hawk relies somewhat tentatively on the Christoff patent, there is no evidence that Christoff is any more material than any of the numerous sonar references that were considered by the examiner during prosecution. Generally, there is no evidence that the problem of tracking high speed watercraft bears any relationship to the problem of discriminating among multiple false echoes in a closed environment to identify the true echo representing level; and there is no suggestion in Christoff that the system being described could be combined with level measurement technology. (Silva Testimony). The ocean is not a closed environment and its acoustic characteristics are not comparable to those in a storage tank. (Silva Testimony).

20. The system disclosed in the Christoff system displays multiple dots (called "pips") representing echo returns, but no automatic mechanism is provided to differentiate among the dots (i.e., to identify the time tag corresponding to any given return and to determine the maximum). (Silva Testimony). Instead, a human operator must differentiate among the dots by their brightness. (Beazley Testimony) (Silva Testimony). In the context of sonar systems at that time, it was thought desirable and necessary to use a highly trained human operator to interpret the dots. Such an operator had to be sophisticated enough to distinguish enemy vessels (which might not be represented by the strongest dot) from friendly vessels and to determine the rate of approach of such vessels, tasks which are still difficult today even with the benefit of recently-developed, highly sophisticated electronic pattern recognition techniques. (Silva Testimony). Thus, Christoff teaches away from the automatic selection of a true echo from multiple false echoes.

### 4. *Other Prior Art References*

21. Throughout the trial of the validity issue, Hawk referred to a summary chart, DX104, which purported to compare claims 43, 44, and 46 to numerous prior art references. The testimony offered by Hawk as to many of the references listed on DX104 (particularly DX80, DX7, DX26, DX77, DX23, DX22, and DX24) did little more than recite the contents of DX104 itself. Such testimony falls far short of the clear and convincing standard. The summary chart listed only selected elements of the patent claims at issue. No effort was made to explain by clear and convincing evidence that each of the elements of the claims at issue was actually disclosed in any one of the listed prior art references. In addition, Hawk changed

numerous entries on the chart from "No" (indicating an admission that the given prior art reference did not disclose a particular claim element) to "X," (retracting that admission) during the trial.

22. Although Hawk discussed a multiplicity of prior art references, it relies in its post-trial briefs on three of those references. Accordingly, in its analysis of the validity of the claims at issue, the Court will give less consideration and weight to the prior art references listed on DX104, which have not been discussed in the briefing.

## C. *Anticipation*

Hawk contends that the Donar publication anticipates each of claims 43, 44, and 46. The Court rejects Hawk's anticipation defense as to each of the claims.

### 1. *Claim 43*

■ 23. Claim 43 relates to "a control system for use in monitoring the level of material in a storage tank." (DX1).

24. Claim 43 also calls for "level indicating means." This Court has already determined that the "function" specified by the level indicating means limitation of claim 43 "involves comparing a series of sample values, each representing the intensity of an echo pulse, to identify the maximum sample value." Slip Op. at 10, 32 USPQ2d at 1771 (Infringement Fact Finding no. 41). This Court further noted that the function "involves identifying the 'time tag' corresponding to the maximum sample value in order to determine the total transit time of the pulse from the transducer to the material level and back, because the total transit time is used to provide an indication of the distance between the transducer and the material level." *Id.* (Infringement Fact Finding No. 43).

25. This Court has already determined that the means disclosed in the '650 specification for performing the level indicating function "may be referred to as a 'digital integrator' (comprising adder 124, MOS register 126, and AND gates 128) followed by a 'digital peak detector' (comprising comparator 130, maximum value register 132, and address register 134), or may be referred to as

a series of components which perform digital data storage, conditioning, and comparison ...". Slip Op. at 13, 32 USPQ2d at 1772 (Infringement Fact Finding No. 51).

26. The Donar publication (DX21) does not disclose a control system for use in monitoring the level of material in a storage tank. Quite to the contrary, it discloses a computer-controlled experimental imaging system designed for application to biological specimens. (Silva Testimony).

27. The Donar publication does not describe performance of the level indicating function set forth in claim 43 and as interpreted above, because there is no disclosure that the Donar system is used to select a maximum sample value and corresponding time tag from among a series of false echo returns. (Silva Testimony).

28. The Donar publication does not include the same or equivalent circuitry as that disclosed in the '650 patent for performing the level indicating function, because while the Donar system includes a computer, there is no disclosure of programming the computer to select a maximum sample value and its associated time tag from among a series of false echo returns. (Silva Testimony).

29. Because the Donar publication does not disclose a control system for use in monitoring the level of material in a storage tank, and because the Donar publication does not disclose level indicating means, there is no clear and convincing evidence that the Donar publication anticipates claim 43. The Court rejects Hawk's challenge to the novelty of claim 43 based upon the Donar publication.

30. Because there is no clear and convincing evidence that any of the other prior art references that have been brought to the Court's attention in this case disclose level indicating means, and because all but one of them (Fryklund) fail to disclose a control system for monitoring the level of material in a storage tank, any challenge to the novelty of claim 43 based upon those prior art references is rejected.

### 2. *Claim 44*

■ 31. Claim 44 recites that the level indicating means includes integrating means and monitoring means. (DX1).

32. Having found that neither the Donar publication nor any of the other prior art references at issue disclose level indicating means at all, the Court finds for the same reasons that none of those references discloses the level indicating means as more narrowly defined in claim 44.

33. Thus, there is no clear and convincing evidence that the Donar publication or any of the prior art at issue anticipates claim 44. Hawk's novelty challenge to claim 44 fails.

### 3. *Claim 46*

34. Claim 46 specifies the position of the transducer ("mounted to the top of said storage tank") as well as the orientation of the transducer ("directed to transmit pulses downwardly toward and to receive pulses reflected upwardly from said material surface"). Claim 46 also specifies the medium through which the ultrasonic pulse is transmitted ("an air space between said tank top and said material surface").

35. Nowhere in the Donar publication is there any disclosure of the transmission of an ultrasonic pulse through "an air space between said tank top and said material surface" to measure distance; the only disclosure is of the transmission of ultrasonic pulses through water (and through the solid test objects). (Silva Testimony). Nowhere in any of the other prior art references at issue (except Fryklund, which is not alleged to anticipate any of the claims) is there any disclosure of the use of air as the coupling medium. (Silva Testimony).

36. The Donar publication does not disclose a storage tank, much less describe where on the storage tank the transducer is mounted. Because the Donar publication does not describe the orientation of the transducer relative to the material being measured, there is no way to tell whether the ultrasonic pulse is directed "downwardly". Defendants' demonstrative exhibits DX92 and DX133, which purport to show a transducer mounted at the top of a storage tank and oriented to transmit its pulse downwardly toward the material surface, are not based upon descriptions from the Donar publication and thus are without factual foundation.

37. Even were we to conclude that the Donar publication discloses every limitation of claim 43, the Court would still conclude that the Donar publication does not disclose the additional limitations of claim 46 requiring transmission downwardly, through an air space.

38. Because there is no clear and convincing evidence that the Donar publication or any of the other prior art references at issue disclose each and every limitation of claim 46, the Court rejects Hawk's novelty challenge to claim 46.

### D. *Fact Findings: Obviousness*

Hawk contends that the Donar publication, combined with the Fryklund patent, would have rendered the subject matter of claims 43, 44, and 46 obvious. Hawk also contends that the Christoff patent, combined with the Fryklund patent, would have rendered the subject matter of claims 43, 44, and 46 obvious. The Court rejects Hawk's obviousness defense as to each of the claims.

### 1. *Graham Factors*

### a. *Scope and Content of the Prior Art*

39. The area of endeavor to which the claimed invention is directed is level measurement in a confined storage tank. Prior art references directed to sonar systems in submarines, radar detection, and imaging systems (e.g. for biological specimens) are outside the relevant field of endeavor.

40. Prior art references directed to sonar systems in submarines, radar detection, and imaging systems (e.g. for biological specimens) are not reasonably pertinent to the problem sought to be solved by the inventor, namely the problem of discriminating among multiple echo returns in a closed storage tank. (Silva Testimony).

41. Accordingly, none of the prior art references relied upon by Hawk except the Fryklund patent, DX10, is analogous art that can properly support an obviousness defense. Although the Court would be entitled to ignore these references in reaching its ultimate legal conclusion of nonobviousness, the Court will evaluate the references as if they were analogous art, for purposes of completeness.

### b. Differences Between the Claimed Invention and the Prior Art

42. Hawk argues that if the Donar publication is combined with the Fryklund patent, the differences between that combination and each of claims 43, 44, and 46 are such as to establish obviousness. Hawk maintains that the Donar publication discloses all of the digital signal processing techniques, while Fryklund teaches the use of a material level control system in which the signal propagates through air.

43. Hawk's argument recalls the very argument presented to the patent examiner during prosecution. The patent applicant pointed out that U.S. Patent No. 3,422,435 to Cragon et al (DX7) disclosed digital signal processing techniques in a *radar* system (PX B, Amendment before First Action, p. 13), but that it lacked any suggestion that such digital processing be used in the confined environment encountered by a material level control system. (PX B, Amendment before First Action, p. 14). Under such circumstances, the Court finds that only hindsight guided by the patent applicant's disclosure would have motivated one of ordinary skill in the art to combine Cragon et al. with a material level control patent such as Fryklund. (PX B, Amendment before First Action, p. 15).

44. Likewise here, the Donar publication does not suggest that the Donar system is designed to deal with multiple false echoes. The differences between the Donar publication and the subject matter of claims 43, 44, and 46 are substantial. Indeed, the differences between the Donar publication and the claimed subject matter as a whole are so substantial that E+H's technical expert, Dr. Silva, testified that he was "amazed" that the Donar publication had been brought up, and that the Donar publication was less material to patentability than the Cragon patent that the patent examiner considered during the prosecution. (Silva Testimony). Only through the exercise of hindsight reconstruction can it be claimed that one of ordinary skill in the art would have been motivated to combine the Donar publication with a material level control patent such as the Fryklund patent.

45. The same reasoning applies to the asserted combination of Christoff and Fryklund. Christoff is less material to patentability than other sonar references that were before the examiner during prosecution. (Silva Testimony). There is no suggestion in Christoff for combining the system described therein with level measurement technology such as that disclosed in Fryklund. In addition, Christoff teaches away from the automatic selection of the true echo response pulse. Only through the exercise of hindsight reconstruction can it be claimed that one of ordinary skill in the art would have been motivated to combine the Christoff patent with a material level control patent such as the Fryklund patent.

46. Testimony from Walter Levine, who worked with Ellery Snyder, the inventor of the subject matter claimed in the '650 patent, confirms that the differences between the sonar art and the claimed level measurement system are substantial. Although Mr. Snyder was a person of extraordinary skill in the ultrasonics art and was familiar with sonar art, he still struggled to develop the invention. (Levine Testimony).

### c. Level of Ordinary Skill in the Art

47. The Court finds that Plaintiffs laid a sufficient foundation for Dr. Leroy Silva's testimony that a hypothetical person of ordinary skill in the art area at issue is a newly-graduated electrical engineer having a bachelor's degree and a C-minus grade point average. (Silva Testimony).

48. Although Hawk attempted to establish the extraordinary skill in the art possessed by Ellery Snyder (named inventor on the '650 patent), Hawk provided no credible evidence to support its argument that the hypothetical person of ordinary skill in the art is a person having not only a relevant technical degree, but also several years' design experience in the use of A/D converters in digital signal processing systems for processing analog acoustic signals. The Court adopts Dr. Silva's definition of a person of ordinary skill in the art.

### 2. Secondary Considerations

49. E+H's competitor, Milltronics (who was aware of the Donar publication,

among other prior art references), gave valuable consideration in exchange for a license under the '650 patent and its Canadian counterpart. (Schaffer Testimony; DX118). Milltronics' tacit recognition of the validity of the '650 patent is a secondary consideration indicative of nonobviousness.

50. Evidence presented at this phase of the trial and at the infringement phase of the trial demonstrated that Hawk designed its device with full awareness of the descriptions in the '650 patent. Hawk's copying is a secondary consideration indicative of nonobviousness.

51. Any conclusion of law stated below, to the extent that it constitutes a finding of fact, is herein incorporated by reference as an additional finding of fact by the court. Any finding of fact stated above, to the extent that it constitutes a conclusion of law, is incorporated by reference below as an additional conclusion of law.

## II. CONCLUSIONS OF LAW ON VALIDITY

### A. Claim Interpretation

1. In determining the validity of the claims at issue in this case, the Court construes the claims in the same way it did in determining infringement. *See Lemelson v. General Mills, Inc.*, 968 F.2d 1202, 1206 n. 4, 23 USPQ2d 1284, 1287 n. 4 (Fed.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 976, 122 L.Ed.2d 131 (1993); *Senmed, Inc. v. Richard–Allan Medical Industries, Inc.*, 888 F.2d 815, 818 n. 7, 12 USPQ2d 1508, 1511 n. 7 (Fed.Cir.1989). *See also W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1279 (Fed.Cir.1988) ("Having construed the claims one way for determining their validity, it is axiomatic that the claims must be construed in the same way for infringement.").

### B. Presumption of Validity

2. The claims of the '650 patent are presumed valid. *See* 35 U.S.C. § 282 [2]. Hawk can overcome the presumption, and

---

**2.** 35 U.S.C. § 282 provides that:
A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be

prevail on its invalidity defense, only by presenting clear and convincing evidence that each of the claims is invalid. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358, 220 USPQ 763, 771 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *Chrysler Motors Corp. v. Auto Body Panels of Ohio Inc.*, 908 F.2d 951, 953, 15 USPQ2d 1469, 1471 (Fed.Cir.1990). E + H has no evidentiary burden to meet. *Therma–Tru Corp. v. Peachtree Doors, Inc.*, 44 F.3d 988, 992, 33 USPQ2d 1274 (Fed.Cir.1995). *See also Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570, 1 USPQ2d 1081, 1084 (Fed.Cir.1986) ("A patent being presumed valid at birth, § 282, a patentee need submit no evidence in support of a conclusion of validity by a court or jury.").

3. Because the presumption of validity is a procedural tool, it is improper to speak of a "weakened" presumption. The presumption of validity is not lessened where a challenger relies upon prior art references that were not before the patent examiner. *The Gillette Co. v. S.C. Johnson & Son Inc.*, 919 F.2d 720, 723, 16 USPQ2d 1923, 1926 (Fed.Cir.1990).

4. The presumption of validity applies separately to each of the claims of a patent, whether those claims are independent or dependent. 35 U.S.C. § 282. Even if a challenger invalidates an independent claim, the challenger still bears the separate burden of invalidating the dependent claims. *Id.* ("... dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim ...").

### C. Legal Standards for Anticipation

5. Anticipation (i.e., lack of novelty) is a question of fact as to which the patent challenger bears the burden of proof by clear and convincing evidence. *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1576, 18 USPQ2d 1001, 1010 (Fed. Cir.1991).

presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.

6. The standard for anticipation is rigorous, requiring a showing of identity of invention. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1565, 24 USPQ2d 1321, 1326 (Fed. Cir.1992). That is, to show that a given claim is anticipated by a prior art reference, the patent challenger must show by clear and convincing evidence that the prior art reference exactly discloses each and every limitation of the allegedly anticipated claim. *E.g., Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 677, 7 USPQ2d 1315 (Fed.Cir. 1988); *Orthokinetics, Inc.*, 806 F.2d at 1574, 1 USPQ2d at 1087. The absence of even a single claim limitation precludes a finding that the prior art reference anticipates the claim. *Atlas Powder Co. v. E.I. duPont de Nemours & Co.*, 750 F.2d 1569, 1574, 224 USPQ 409, 411 (Fed.Cir.1984).

7. In determining anticipation, the Court must read the claims "in the context of the patent specification in which they arise and in which the invention is described. If needed to impart clarity or avoid ambiguity, the prosecution history and the prior art may also be consulted in order to ascertain whether the patentee's invention is novel or was previously known to the art." *Glaverbel Societe Anonyme v. Northlake Marketing*, 45 F.3d 1550, 1554, 33 USPQ2d 1496 (Fed.Cir. 1995) (quoting *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1458, 221 USPQ 481, 485 (Fed.Cir.1984)). The Court must also consider each element of the claim; it is improper to disregard functional language or language in the preamble of the claim. *Pac–Tec, Inc. v. Amerace Corp.*, 903 F.2d 796, 801, 14 USPQ2d 1871, 1876 (Fed.Cir.1990).

8. Anticipation "requires identity of the claimed process and a process of the prior art; the claimed process, including each step thereof, must have been described or embodied, either expressly or inherently, in a single reference." *Glaverbel*, 45 F.3d at 1554; *Structural Rubber Prod. Co. v. Park Rubber Co.*, 749 F.2d 707, 716, 223 USPQ 1264, 1270 (Fed.Cir.1984) (anticipation can be established only by proof that a *single* prior art reference discloses each and every element of the claimed invention).

9. Where, as here, one or more of the claim limitations is drafted in "means-plus-function" format, the patent challenger's task is even more complicated. Under 35 U.S.C. § 112, ¶ 6, means-plus-function limitations cover "the corresponding structure, material, or acts described in the specification and equivalents thereof". This provision applies "regardless of the context in which the interpretation of means-plus-function language arises, i.e., whether as part of a patentability determination in the PTO [Patent and Trademark Office] or as part of a validity or infringement determination in a court." *In re Donaldson Co., Inc.*, 16 F.3d 1189, 1193, 29 USPQ2d 1845, 1849 (Fed.Cir.1994) (in banc).

10. Thus, with regard to the level indicating means limitation of claim 43, Hawk must show by clear and convincing evidence that circuitry in the Donar reference (1) performs the identical function recited in the level indicating means and (2) performs that function using the same circuitry disclosed in the '650 specification or equivalents thereof. *Carroll Touch, Inc. v. Electro Mechanical Systems, Inc.*, 15 F.3d 1573, 1578 (Fed.Cir. 1993); *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934, 4 USPQ2d 1737, 1739 (Fed.Cir.1987) (in banc).

11. Claim limitations drafted in means-plus-function format cannot be met by an element in a reference that performs a different function than the function recited in the means-plus-function limitation. *RCA Corp. v. Applied Digital Data Sys.*, 730 F.2d 1440, 1444, 221 USPQ 385, 388 (Fed.Cir. 1984).

12. In the infringement phase of the trial, the Court had no occasion to interpret expressly the meaning of the phrase "storage tank" as used in claim 43 and the meanings of "top" and "downwardly" as used in the claim 46 (in the phrase "said transducer is mounted to the top of said storage tank and is directed to transmit pulses downwardly toward and to receive pulses reflected upwardly from said material surface ...").

13. As to the meaning of "storage tank" in claim 43, the Court has applied to that phrase its ordinary meaning (a vessel having sides, a bottom, and perhaps a top). The

Court rejects as contrary to the plain meaning of the claim language Hawk's arguments that the land masses of the earth confine the ocean in a "storage tank," or that the human mouth is a storage tank.

14. As to the terms in claim 46, the Court has interpreted "downwardly" as having its common meaning (i.e., directed toward the center of the earth) and interprets "top" in like fashion. The Court declines Hawk's invitation to interpret these terms such that they have no meaning and are effectively erased from claim 46. Even Mr. Beazley, the designer of the infringing device, admitted at trial in response to the Court's questions that if "top" is interpreted so as to include "bottom," and "downwardly" to include "upwardly," the terms "top" and "downwardly" would lack any meaning. (Beazley Testimony).

15. Based on these standards, the Court finds that the claims of the '650 patent are not invalid for anticipation. Hawk has failed to demonstrate by clear and convincing evidence that independent Claim 43 and dependent Claims 44 and 46 were anticipated by the Donar article or that Donar disclosed every structural and functional element recited in Claims 43, 44, and 46.

## C. *Legal Standards for Obviousness*

15. Under 35 U.S.C. § 103, a claim is not patentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

██ 16. Obviousness is a question of law dependent upon a variety of well-established factual inquiries. *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 541, 16 USPQ2d 1622, 1624 (Fed.Cir.1990), *cert. denied*, 500 U.S. 918, 111 S.Ct. 2017, 114 L.Ed.2d 103 (1991). The patent challenger bears the burden of demonstrating the underlying facts pertinent to the obviousness conclusion by clear and convincing evidence. *RCA Corp.*, 730 F.2d at 1444, 221 USPQ at 388.

██ 17. Whether or not a claimed invention is obvious is dependent upon three primary factual inquiries: (1) scope and content of the prior art; (2) differences between the claimed invention and the prior art devices; and (3) level of ordinary skill in the art. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966).

18. In addition, a variety of "secondary" factual considerations must be taken into account. *Hybritech v. Monoclonal Antibodies Inc.*, 802 F.2d 1367, 1380, 231 USPQ 81, 90 (Fed.Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). Secondary considerations which are particularly pertinent to the issues in this case include industry recognition of or acquiescence in the patent's validity (e.g. by licensing), *In re Sernaker*, 702 F.2d 989, 996, 217 USPQ 1, 6 (Fed.Cir.1983); and copying by the infringer, *Dow Chemical Co. v. American Cyanamid Co.*, 816 F.2d 617, 2 USPQ2d 1350 (Fed.Cir. 1987), *cert. denied*, 484 U.S. 849, 108 S.Ct. 149, 98 L.Ed.2d 105 (1987). Other factors include: whether the invention has been commercially successful, *see Panduit Corp. v. Dennison Manufacturing Co.*, 810 F.2d 1561, 1573 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); whether there was a longfelt need for the invention, *see W.L. Gore & Associates v. Garlock, Inc.*, 721 F.2d 1540, 1545 (Fed.Cir. 1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); whether others tried to solve the problem the invention solves and failed, *see Jones v. Hardy*, 727 F.2d 1524, 1531–32 (Fed.Cir.1984); and whether others skilled in the art were skeptical about the invention's potential, *see Burlington Indus. v. Quigg*, 822 F.2d 1581, 1583 (Fed.Cir.1987).

19. Evidence of secondary considerations "may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39, 218 USPQ 871, 879 (Fed.Cir.1983).

20. While some patentees may show that the commercial success of a claimed invention constitutes a secondary consideration tending to show that the claimed subject matter would not have been obvious, *see Hybritech,* 802 F.2d at 1380, 231 USPQ at 90, infringers cannot successfully argue that the lack of commercial success alone proves that the claimed subject matter would have been obvious. *Datascope Corp. v. SMEC, Inc.,* 776 F.2d 320, 327, 227 USPQ 838, 843 (Fed.Cir.1985); *Miles Laboratories, Inc. v. Shandon Inc.,* 997 F.2d 870, 878 (Fed. Cir.1993) ("[Objective evidence], if present, would weigh in favor of non-obviousness, although the lack of such evidence does not weigh in favor of obviousness.").

21. Most fundamentally, however, in adjudging obviousness, the Court must evaluate the prior art in light of the problem that the inventor sought to solve. "The problem confronted by the inventor must be considered in determining whether it would have been obvious to combine references in order to solve that problem." *Diversitech Corp. v. Century Steps, Inc.,* 850 F.2d 675, 678–79, 7 USPQ2d 1315, 1318 (Fed.Cir.1988).

22. As to the scope and content of the prior art, the Court should consider only "analogous" prior art references, and need not consider references which are so remote as to be "nonanalogous." *In re Clay,* 966 F.2d 656, 658, 23 USPQ2d 1058, 1060 (Fed.Cir.1992). To determine whether or not a reference is analogous, the Court should first consider whether the reference is within the inventor's field of endeavor. *Clay,* 966 F.2d at 658–59, 23 USPQ2d at 1060. If the reference is not within the inventor's field of endeavor, the Court should next consider whether the reference is nonetheless reasonably pertinent to the problem being solved by the inventor. *Id.* A reference is reasonably pertinent "when a person of ordinary skill would reasonably have consulted those references and applied their teachings in seeking a solution to the problem that the inventor was attempting to solve." *Heidelberger Druckmaschinen AG v. Hantscho Commercial Products, Inc.,* 21 F.3d 1068, 1071, 30 USPQ2d 1377 (Fed.Cir.1994). A reference that fails both of these tests is nonanalogous art and cannot be used to show obviousness. *Clay,* 966 F.2d at 658.

23. As to the level of ordinary skill in the art, obviousness is not determined by reference to "geniuses in the art." *Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.,* 807 F.2d 955, 962, 1 USPQ2d 1196, 1201 (Fed.Cir.1986); *Environmental Designs, Ltd. v. Union Oil Co of California,* 713 F.2d 693, 697, 218 USPQ 865, 868–69 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). Instead, a person of ordinary skill in the art is "one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate ...". *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 454, 227 USPQ 293, 298 (Fed.Cir.1985). It follows that the actual inventor's skill and experience cannot be determinative of the level of ordinary skill in the art. *Custom Accessories, Inc.,* 807 F.2d at 962, 1 USPQ2d at 1201.

24. In determining the level of ordinary skill in the art the Court considers: (1) the educational level of the inventor; (2) the educational level of those who work in the field (i.e. the industry which manufactured the given technology); (3), the sophistication of technology involved; (4) the type of problems encountered in the art; (5) prior art solutions to those problems; (6) rapidity with which innovations are made. *See Ryko Manufacturing Co. v. Nu–Star, Inc.,* 950 F.2d 714, 718, 21 USPQ2d 1053, 1057 (Fed.Cir. 1991); *Custom Accessories, Inc.,* 807 F.2d at 962–63, 1 USPQ2d at 1201.

25. The level of skill in the art is measured as of the time the invention was made and is typified by an engineer of low to medium skill in the relevant technology. *See Ryko,* 950 F.2d at 719, 21 USPQ2d at 1058; *In re Epstein,* 32 F.3d 1559, 1564 n. 4, 31 USPQ2d 1817, 1820 n. 4 (Fed.Cir.1994) (citing *Graham,* 383 U.S. at 17, 86 S.Ct. at 693–94, 148 USPQ at 467).

26. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry. Instead of ascertaining what

was subjectively obvious to the inventor at the time of invention, the court must ascertain what would have been objectively obvious to one of ordinary skill in the art at such time." *Ryko,* 950 F.2d at 718.

27. While proof of obviousness, unlike proof of anticipation, may rest upon a combination of prior art references, the party asserting obviousness cannot simply "pick and choose among the individual elements of assorted prior art references to recreate the claimed invention." *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.,* 859 F.2d 878, 887, 8 USPQ2d 1468, 1475 (Fed. Cir.1988). To justify a combination of references, Hawk must present evidence of "some teaching, suggestion or incentive supporting the combination." *Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 934, 15 USPQ2d 1321, 1323 (Fed.Cir.1990); *Carella v. Starlight Archery,* 804 F.2d 135, 140, 231 USPQ 644, 647 (Fed.Cir.1986). *See also In re Laskowski,* 871 F.2d 115, 117, 10 USPQ2d 1397 (Fed.Cir.1989) ("The mere fact that the prior art could be [modified to recreate the invention] would not have made the modification obvious unless the prior art suggested the desirability of the modification").

28. Put another way, in an obviousness analysis, the claimed invention must be considered as a whole, as must the prior art. "Focusing on the obviousness of substitutions and differences instead of on the invention as a whole" is legally improper. *Gillette Co. v. S.C. Johnson & Son, Inc.,* 919 F.2d 720, 724 (Fed.Cir.1990) (citing *Hybritech,* 802 F.2d at 1383, 231 USPQ at 93).

29. Likewise, focusing on portions of prior art references that are relevant to the claimed invention while ignoring other portions that teach away from the claimed invention is also improper. *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 448, 230 USPQ 416, 420 (Fed.Cir.1986).

30. Section 103 mandates that obviousness be evaluated as of the time the invention was made, not as of the time of the litigation. Specifically, the Court must consider the problem confronted by the inventor in "determining whether it would have been obvious to combine references in order to solve that problem." *Diversitech,* 850 F.2d at 679. "Care must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.'" *Grain Processing Corp. v. American Maize–Products Corp.,* 840 F.2d 902, 907, 5 USPQ2d 1788, 1792 (Fed.Cir. 1988) (citing *Orthopedic Eqpt. Co. v. United States,* 702 F.2d 1005, 1012, 217 USPQ 193, 199 (Fed.Cir.1983)).

31. Obviousness is not determined on the basis of a "would have been able to produce" test. *Orthokinetics, Inc.,* 806 F.2d at 1575, 1 USPQ2d at 1089–90. An assertion in litigation that one would have been able to program a computer to produce a given result does not lead *ipso facto* to a conclusion of obviousness; indeed, such an assertion is more likely the product of hindsight. *See, e.g., In re Newell,* 891 F.2d 899, 901, 13 USPQ2d 1248, 1250 (Fed.Cir.1990) ("[A] retrospective view of inherency is not a substitute for some teaching or suggestion which supports the selection and use of the various elements in the particular claimed combination.").

32. An infringer's need to cite a large number of prior art references can indicate to a court that the invention was novel and not obvious. *State Industries, Inc. v. A.O. Smith Corp.,* 221 USPQ 958, 973, 1983 WL 327 (M.D.Tenn.1983), *aff'd in part, rev'd in part,* 751 F.2d 1226 (Fed.Cir.1985).

### D. *Application of Nonobviousness Standards*

33. Based upon the Court's factual findings as to the *Graham* factors and secondary considerations (*supra*), the Court concludes that Hawk has failed to show by clear and convincing evidence that the differences between the invention as set forth in claim 43 and the prior art (including, but not limited to, the combination of the Donar publication with the Fryklund patent and the combination of the Christoff patent with the Fryklund patent) are such that the invention set forth in claim 43 as a whole would have been obvious to one of ordinary skill in the art.

Hawk's obviousness defense as to claim 43 thus fails.

34. Based upon the Court's factual findings as to the *Graham* factors and secondary considerations (*supra*), the Court concludes that there is no clear and convincing evidence that the differences between the invention as set forth in claim 44 and the prior art (including, but not limited to, the combination of the Donar publication with the Fryklund patent and the combination of the Christoff patent with the Fryklund patent) are such that the invention set forth in claim 44 as a whole would have been obvious to one of ordinary skill in the art. Hawk's obviousness defense as to claim 44 thus fails.

35. Based upon the Court's factual findings as to the *Graham* factors and secondary considerations (*supra*), the Court concludes that there is no clear and convincing evidence that the differences between the invention as set forth in claim 46 and the prior art (including, but not limited to, the combination of the Donar publication with the Fryklund patent and the combination of the Christoff patent with the Fryklund patent) are such that the invention set forth in claim 46 as a whole would have been obvious to one of ordinary skill in the art. Hawk's obviousness defense as to claim 46 thus fails.

36. In arriving at these conclusions, the Court has considered all of the evidence, including particularly the conflicting expert testimony. The Court credits the expert opinions of Dr. Silva, who was well-qualified to testify about the state of the art as it existed at the time in question. Based upon his familiarity with those of ordinary skill in the art at the time in question, Dr. Silva was well-qualified to evaluate the prior art references from the perspective that those of ordinary skill at the time would have possessed.

37. The Court has considered, but does not credit, the expert testimony of Mr. Beazley (the designer of the infringing Hawk device) on the issue of validity. No foundation was established that Mr. Beazley could evaluate the prior art references from the perspective of those of ordinary skill in the art at the time the invention was made. Mr. Beazley himself was not working in the field at the time, and Defendants presented no

evidence establishing that he could testify from the perspective of the ordinary artisan.

38. The Court has considered, but does not credit, the expert testimony of Mr. Burton. Mr. Burton, a patent lawyer who held a civil engineering degree, was not himself one of ordinary skill in the art at the time when the claimed invention was made, and there was no factual foundation to establish that Mr. Burton could testify from the perspective of the ordinary artisan.

39. The Court finds that Mr. Walter Levine was a person of extraordinary skill in the field at the relevant time period given his background as a member of the original team who designed the Snyder device. Accordingly, he could not testify from the perspective of the ordinary artisan. *See Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1138 (Fed.Cir.1985) ("The invention must be evaluated not through the eyes of the inventor, who may have been of exceptional skill, but as by one of 'ordinary skill' "). Moreover, Levine's testimony suggested the difficulty of making the Snyder device operational given the high skill-level of the three-member team of Snyder, Levine and Urban.

40. The Court is aware that the Patent and Trademark Office (PTO) has granted Hawk's request for reexamination of the '650 patent. However, the decision to proceed with reexamination is not a final decision on claim validity and is not binding on this Court. It is, instead, a preliminary decision based solely on Hawk's submissions to the PTO, with no input from E + H. *Patlex Corp. v. Mossinghoff,* 771 F.2d 480, 483, 226 USPQ 985, 986 (Fed.Cir.1985). Given the potentially lengthy nature of the PTO procedures, this Court must make its decision based upon the record before it, with the full expectation that the PTO will do the same.

## III. *CONCLUSION*

Based upon the findings and conclusions set forth herein, the Court rejects Hawk's challenges to claims 43, 44, and 46 of the '650 patent based on the defenses of anticipation and obviousness. The Court finds that Hawk has not produced clear and convincing

evidence that any of claims 43, 44, or 46 is invalid.

It is so ORDERED.